IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

AIKEN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| Norfolk Southern Railway Company, | ) | |
| | ) | C.A. No. : 1:08-cv-01707-MBS |
| Defendant, | ) | |

MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(1)
or RULE 12(b)(6), FEDERAL RULES OF CIVIL PROCEDURE

Norfolk Southern Railway Company, by and through its undersigned counsel, hereby

moves and respectfully seeks an order dismissing the complaint filed against it in this matter

pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.  Alternatively, this matter should

be dismissed pursuant to Rule 12(b)(6),  for failure to state a claim upon which relief can be

granted.[1]

---

[1] [1] Pursuant to Local Civil Rule 7.04 DSC, this motion is filed without a supporting memorandum as it contains a full explanation of the grounds for the motion.

STATEMENT

On April 23, 2008, the United States filed a complaint against Norfolk Southern Railway Company (NS) seeking injunctive relief and an assessment of civil penalties for alleged violations of the Clean Water Act, (CWA) 33 U.S.C. §§ 1251-1387, and civil penalties for an alleged untimely report under Section 103(a) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9603(a). The suit arises out of the January 6, 2005, derailment in Graniteville, South Carolina. The Court is already familiar with the general circumstances surrounding this tragic event from other litigation filed earlier in this court involving this accident. Accordingly, for purposes of this motion, the underlying facts can be recited with brevity.

The Derailment at Graniteville

At approximately 2:39 a.m. on January 6, 2005, a northbound Norfolk Southern train (Train P192) encountered a misaligned switch in Graniteville, while traveling from Augusta, Georgia to Columbia, South Carolina. Train 192 was diverted from the railroad's mainline onto an industrial spur at the Avondale Mills textile plant. *See Operations Group Factual Report*, NTSB, DCA FR 008, p. 3.[2] Train 192 collided with another train, the "Aiken local" (Train P22), parked on the industrial spur. *Id.* In the event, both locomotives and sixteen of the railroad cars of Train 192 derailed, as well as the locomotive and one of the cars of Train P22. *Id.* One of the railroad cars was breached in the collision, resulting in a release of chlorine that vaporized and became a gas.

---

[2] In considering a Motion to Dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), it is appropriate for courts to look beyond the four corners of a complaint and consider those matters that are of public record and judicially noticeable. *See, U.S. v. North Carolina*, 180 F. 3d 574 (4th Cir. 1999); *White v. Lee*, 227 F. 3d 1214 (9th Cir. 2000). The same holds true for Motions to Dismiss for failure to state a claim on which relief can be granted under Rule 12(b)(6). *See, Norfolk Southern Ry. Co. v. Shulimson*, 1 F. Supp. 2d 553 (D, N.C. 1998). Here, NS presents government documents that comprise factual reports of this event and were formerly available on the National Transportation Safety Board's website. Because these reports no longer appear to be available in that format, they are appended to this Motion as Exhibits. This factual report is appended to this Motion as Exhibit 1.

The location of the accident site is an unincorporated community in the southwestern corner of the state. *Survival Factors Factual Report*, NTSB, DCA 05 MR 008 (Sept. 28, 2005), pp. 8-9[3].  Graniteville is about 4.5 miles west of the City of Aiken, and about 9.8 miles northeast of Augusta, Ga. *Id.* The track where the derailment and collision occurred is referred to as "industrial track" because that track served Avondale Mills, a textile manufacturer whose large buildings and parking lot lie in the approximately 1,000 feet of space between the industrial track and a stream called Horse Creek.  Three of the four claims in the government's case against NS concern Horse Creek.

It is a matter of public record, as described by the National Transportation Safety Board's (NTSB) Survival Factors Working Group, that within the first twenty minutes after the derailment and collision occurred, there were four communications between Norfolk Southern and local emergency responders. *Survival Factors Factual Report*, NTSB, DCA 05 MR 008 (Sept. 28, 2005), exhibit 14 (NS Timeline).[4]  Railroad employees briefed Phil Napier, the Chief of the Graniteville-Vaucluse Volunteer Fire Department who had primary jurisdiction over the incident scene, less than 30 minutes after the collision.  *Id.* The consist from Train 192, detailing the cars being transported, was also furnished within a half hour of the derailment.  Because there had been a then-unidentified chemical release from the one breached railcar, local authorities almost immediately began an evacuation of the area.  (*Id.* at 20-26.*)*

According to the federal Centers for Disease Control, chlorine is an element used in industry and one of the most commonly manufactured chemicals in the United States.[5]  It is used in the making of paper and cloth, household products, rubber and solvents.  It is used in drinking

---

[3] This report is appended to this Motion as Exhibit 2.
[4] The timeline attached to this factual report is appended to this Motion as Exhibit 3.
[5]  See, http://www.bt.cdc.gov/agent/chlorine/basics/facts.asp for a more complete discussion of the uses and properties of chlorine.

water and in swimming pools to kill harmful bacteria.  It is also used as part of the sanitation process for industrial wastes and sewage.  Chlorine is transported in rail tank cars as a super-cooled pressurized liquid.  When liquid chlorine is exposed to air, it vaporizes rapidly from a liquid to a gas as it escapes from its container, and can form a gaseous cloud with a volume over 400 times greater than the volume of liquid released.  Because chlorine in a gaseous state is actually 2 ½ times heavier than air (as are its other compounds immediately formed when chlorine is released into moist air), a cloud of gas formed from a leak of liquid chlorine tends to settle in low areas rather than rising and traveling a great distance.  Finally, chlorine is extremely reactive, so when it vaporizes into the atmosphere from a liquid state, its chemical composition changes almost instantly and becomes hydrochloric and hypochloric acid. *See,* Atlas of Electrochemical Equilibria in Aqueous Solutions, Marcel Pourbaix, *National Association of Corrosion Engineers,* 1966,  Ch. IV, Section 20.2, p. 600;[6] *see also,* Handbook of Industrial Water Conditioning, Betz, 8th ed, 1980, ch. 4, p. 19.[7]

The United States' Complaint

The government's complaint alleges that NS committed four violations of law arising out of the Graniteville event, and seeks civil penalties for three of those violations and injunctive relief for the fourth claim.  In the "Statutory Background" section, the complaint first alleges that Section 311(b)(3) of the Clean Water Act, 33 U.S.C. § 1321(b)(3), prohibits the discharge of oil or of hazardous substances "into or upon the navigable waters of the United States or adjoining shorelines" in such quantities as may be determined to be "harmful." (¶ 6).  The complaint further alleges that EPA, acting through delegated authority, has determined that chlorine is a hazardous substance with a "reportable quantity" of 10 pounds for purposes of Section 311(b)(3)

---

[6]  Pertinent pages from this standard text are appended to this Motion as Exhibit 4.
[7]   Pertinent pages from this standard text are also appended to this Motion as Exhibit 5.

of the Act. (¶ 7). *See,* 40 C.F.R. Part 117, Table 117.3. Similarly, the complaint declares that

EPA has also determined by regulation that quantities of oil that may be harmful for purposes of

Section 311 include discharges of oil that, inter alia, cause "a film or sheen upon, or

discoloration of the surface of the water." ( ¶ 8). *See,* 40 C.F.R. § 110.3(b). Also included in the

statutory background provisions is a reference to Section 311(b)(7)(D) of the Clean Water Act,

33 U.S.C. § 1321(b)(7)(D), which allows for the imposition of civil penalties in greater amounts

than otherwise permissible by law if the conduct of the owner or operator of a facility from

which the release occurred in violation of Section 311(b)(3) is found to involve gross negligence

or willful misconduct. (¶ 10).[8]

The complaint declares that Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the

"discharge of any pollutant" into "waters of the United States" by any person except as in

compliance with the Act. (¶ 11)[9] Finally, the complaint invokes section 103(a) of the

Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42

U.S.C. § 9603(a), which requires any person in charge of an onshore facility, as soon as he or she

has knowledge of a release of a hazardous substance into the environment in reportable

quantities to immediately notify the National Response Center of that release. (¶ 13).

The complaint then presents a series of general allegations, each in extremely conclusory

form. The United States asserts that NS owns and operates a railroad whose tracks pass through

---

[8] NS strongly disputes any suggestion by the United States that its conduct in this incident constitutes gross negligence or willful misconduct. However, the evidentiary insufficiency of these allegations is not at issue in this motion brought pursuant to Rule 12(b).

[9] It should be noted that Section 311 differs from Section 301(a) of the Act, the latter provision establishing the unpermitted discharge requirement that is the trigger for permits under both Section 402 and 404, those sections of the CWA that establish the National Pollution Discharge Elimination System of permits for industrial discharges, and the permitting program for discharges of dredged or fill material, respectively. Liability under Section 311 is more limited and narrower. Whereas Section 301 makes the "discharge of any pollutant" unlawful, Section 311 addresses the "discharge of oil or hazardous substances *into or upon the navigable waters of the United States....*" 33 U.S.C. § 1321(b)(3). In contrast, in Section 301, the "discharge of a pollutant" is defined by reference to Section 502 of the Act as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Thus, Section 311 liability is narrower than that created by Section 301. However, for purposes of deciding this motion, the jurisdictional provisions in these sections of the CWA are treated as if they were interchangeable.

Graniteville, S.C. (¶¶ 15, 16). The complaint alleges that at "2:39 a.m. on January 6, 2005, Norfolk Southern Train 192 ('Train 192') was traveling through Graniteville at approximately 47 miles per hour when it encountered an improperly lined switch that diverted it from the main line onto an industrial siding, where the train collided head on with Norfolk Southern Train P-22 ('Train P-22'), which was parked and unoccupied at the time of the collision." (¶ 17). "The collision derailed both of Train 192's locomotives as well as 16 of its 42 freight cars. Among the derailed cars were three tank cars containing chlorine, one of which was breached during the accident. Chlorine discharged from the breached tank car." (¶ 18). The complaint asserts: "Chlorine discharged from the breached tank car settled upon and was absorbed into Horse Creek, its tributaries and their adjoining shorelines, injuring and killing fish and vegetation." (¶ 20.) Also, the government declares that "[d]uring the collision the fuel tank on Train 192's second engine ruptured and the fuel tank on Train P-22's engine was punctured by debris. The two breached fuel tanks released diesel fuel into Horse Creek, its tributaries and their adjoining shorelines." (¶ 21). Finally, in ¶ 25, the United States simply asserts: "Horse Creek and its tributaries are 'navigable waters of the United States' within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3); and "navigable waters' within the meaning of Section 507(7) of the CWA, 33 U.S.C. § 1362(7).

The complaint presents four claims for relief. The first claim asserts that chlorine is a "hazardous substance" within the scope of the CWA, that the release from Train 192's tank car was a "discharge" under the Act, and that NS "discharged chlorine in excess of the reportable quantity of 10 pounds into or upon Horse Creek, its tributaries and their adjoining shorelines...." (¶ 29). The second claim asserts that diesel fuel is "oil" within the meaning of the CWA, that the release of diesel fuel from the engines of the trains was a "discharge" under the Act, and that

Norfolk Southern "discharged oil in a quantity sufficient to cause a sheen upon or discoloration of the surface of the water into or upon Horse Creek, its tributaries and their adjoining shorelines…." (¶ 33). The third claim asserts that both chlorine and diesel fuel are "pollutants" under the CWA, and that the discharge of these pollutants into Horse Creek and its tributaries is in violation of Section 301(a) of the Act, for failure to have a permit for such discharges. (¶¶ 34-39). Then, the government alleges in its fourth claim that chlorine is a "hazardous substance," that the release from the tank car was a "release," and that Norfolk Southern "did not immediately notify the National Response Center as soon as it had knowledge that a release of chlorine in excess of 10 pounds from one of Train 192's tank cars had occurred, in violation of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a)." (¶ 44).

## ARGUMENT

I. THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(b)(1) FOR LACK OF SUBJECT MATTER JURISDICTION.

A.    <u>In every complaint, the plaintiff has an obligation to demonstrate the basis for federal court jurisdiction, and must go beyond conclusory assertions that subject matter jurisdiction exists.</u>    Because federal courts are courts of limited jurisdiction, they "only can adjudicate those matters that arise under Article III of the Constitution and a congressional authorization enacted thereunder." 5B Wright & Miller, Federal Practice and Procedure § 1350, p. 64 (3rd ed. 2004). " [T]here is no presumption that they have subject matter jurisdiction to adjudicate a particular case. Indeed, until the court's jurisdiction is *demonstrated*, the converse is true. Hence, the complaint in a federal court must *demonstrate* that a basis for federal

jurisdiction exists…." 4 Wright & Miller, § 1206, p.110. (Emphasis added). "Demonstration" includes the concept of "proving." See, for example, *Random House Webster's College Dictionary,* 2nd ed., 2001: "the act of proving, as by reasoning or a show of evidence." For that reason, courts have recognized that the plaintiff bears the burden of proving that subject matter jurisdiction exists. *Evans v. B.F. Perkins Co.,* 166 F. 3d 642, 647 (4th Cir. 1999); *Adams v. Bain,* 697 F. d 1213, 1219 (4th Cir. 1982). Proof requires more than mere allegation. *Bollenbacher v. Helena Chemical Co.,* 926 F. Supp. 781, 787 (ND Ind. 1996).

A plaintiff satisfies this threshold jurisdictional obligation by complying with Rule 8(a)(1), Fed. R. Civ. P. That rule requires "a short and plain statement of the grounds for the court's jurisdiction," and is virtually identical to the requirement in Rule 8(a)(2) of "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the… claim is and the grounds upon which it rests," *Conley v. Gibson,* 355 U.S. 41, 47 (1957). These provisions "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented" and do not authorize a pleader's "bare averment that he wants relief and is entitled to it." 5 Wright & Miller § 1202, at 94, 95. For these reasons, "a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and *a formulaic recitation of the elements of a cause of action will not do*, …" *Bell Atlantic Corp. v. Twombly,* 550 U.S. ___ , 127 S. Ct. 1955, 1965 (2007)(emphasis added).

Where a statute contains its own special jurisdictional provision such as Section 309 or 311(b) in the Clean Water Act – as opposed to general federal question jurisdiction under 28 U.S.C. § 1331 or another, similar, general provision, a plaintiff's obligation is especially critical: its complaint "must support the jurisdictional allegation….Enough should be alleged in the

statement of the claim to show that the action does arise under the statute on which it purports to be based. *Indeed, it is these statements in the body of the pleading that give the district court subject matter jurisdiction and not the mere conclusory reference to or recitation of a federal statute in the jurisdictional allegations.*" 4 Wright & Miller, § 1210, p.146 (emphasis added). "It is well settled that the recitation of a statute can neither deprive a court of jurisdiction nor confer jurisdiction upon it. It is the operative facts pleaded which alone can do that." *Beeler v. U.S.* 338 F. 2d 687, 698 (3rd Cir. 1964).

B.     When the plaintiff's complaint relies upon mere conclusory allegations to establish the court's jurisdiction, the defendant's appropriate response is a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Fed. R. Civ. P. A motion to dismiss brought under Rule 12(b)(1) raises the fundamental question of whether a court has subject matter jurisdiction to hear the dispute presented to it. It presents a threshold question concerning a court's power to act. *Nelson v. U.S. Postal Service,* 189 F. Supp. 2d 450 (E.D. Va, 2002). When the defendant challenges an allegation of subject matter jurisdiction by filing a Rule 12(b)(1) motion to dismiss, the plaintiff bears the burden of persuasion to demonstrate that subject matter jurisdiction does exist. *Williams v. United States of America,* 50 F. d 299 (4th Cir. 1995); *Goewey v. U.S.,* 886 F. Supp. 1268, 1274 (D.S.C. 1995).

A plaintiff has an obligation under Rule 8(a)(2) to state a claim on which relief can be granted which is similar in many ways to its duty under Rule 8(a)(1) to identify the court's jurisdiction. In this context, the Supreme Court observed that, while the Federal Rules may have eliminated generally the cumbersome requirement of engaging in detailed factual pleadings, Rule 8(a)(2) still "requires a 'showing' rather than a blanket assertion, of entitlement to relief." *Bell Atlantic Corp., supra,* 127 S. Ct. at 1965, fn. 3 (2007). In that recent decision, the Court

"retired" the fifty-year old "*Conley v. Gibson* pleading standard" which had held that no complaint should be dismissed for Rule 8 deficiencies unless "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. at 45-46. The *Bell Atlantic* Court abrogated this venerable formulation because it appeared a literal application of *Conley* had resulted in "wholly conclusory statement[s] of claim … surviv[ing] a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed]facts' to support recovery." 5 Wright & Miller, § 1216, p. 29-30 (2008 pocket part). Accordingly, a plaintiff now must provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do" when confronted by a motion to dismiss. *Bell Atlantic Corp, supra.*, at 1965. As noted earlier, this requirement obtains in part because of the constitutional notion that a complaint must give "fair notice" of the nature of the claim. *Id.,* at 1965, fn. 3. As stated by the Seventh Circuit in *Limestone Development Corp. v. Village of Lemont, Illinois,* __ F.3d. ____, (7th Cir. 2008), 2008 WL 852586, at p. 6:

> Under *Bell Atlantic,* the complaint in a potentially complex litigation, or one that by reason of the potential cost of a judgment to the defendant created the 'in terrorem' effect against which *Blue Chip* warned, must have some degree of plausibility to survive dismissal….In a complex antitrust or RICO case a fuller set of factual allegations than found in the sample complaints in the civil rules' Appendix of Forms may be necessary to show that the plaintiff's claim is not 'largely groundless,' …If discovery is likely to be more than usually costly, the complaint must include as much factual detail and argument as may be required to show that plaintiff has a plausible claim.

Here, Congress has declared that this Court's jurisdiction to enforce the Clean Water Act is limited to those matters that involve a "discharge" of a pollutant or hazardous substance into the "navigable waters of the United States." These are jurisdictional limitations, similar to a plaintiff's need to demonstrate various "predicate acts" in order to establish jurisdiction under

the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S. C. § 1961, et seq. It is

appropriate to hold plaintiff to some measurable detail of factual pleading in order to satisfy a

defendant's constitutional right to fair notice. It is equally important to require that same degree

of specificity when the fundamental question of a federal court's jurisdiction is at stake. But

here, this Court lacks jurisdiction under the Clean Water Act because there is no demonstration

(or proof) by plaintiff that federally protected "waters of the United States" or "navigable waters

of the United States" have been affected by a "discharge." The stark, unadorned conclusions in

this complaint do not establish jurisdiction: there is no evidence, no factual proffer, no

demonstration that "discharges" regulated under the Act reached "navigable waters of the United

States" regarding the first three claims, and no showing why the report to the National Response

Center was untimely under the fourth claim. As shown below, other courts have dismissed

similar claims when the government was unable to satisfy each of those statutory elements in

order to establish jurisdiction under the CWA and under CERCLA. This Court should do

likewise.

     C.    <u>All claims must be dismissed under Rule 12(b)(1) for failure to establish subject</u>

<u>matter jurisdiction.</u>  In the first claim, the United States alleges that chlorine is a hazardous

substance, and that chlorine released from the breached tank car resulted in a discharge into a

navigable water of the United States, Horse Creek, in excess of reportable quantities.

(Complaint, ¶¶ 26-29). In its second claim, it makes a similar assertion with respect to diesel

fuel released from the locomotives involved in the collision. (*Id.* ¶¶ 30-33). The third claim

asserts that these discharges into covered waters occurred without a permit under the Act. (*Id.* ¶¶

34-39). The fourth and final claim asserts a violation of a duty under CERCLA to timely report

the chlorine release to the National Response Center. (*Id.* ¶¶ 40-44). None of these claims

establishes subject matter jurisdiction under the relevant statute.

        1.      **The complaint's simple, unadorned assertion that Horse Creek is a**

**navigable water of the United States, in the absence of any facts to demonstrate**

**navigability, or that the Creek was a "water of the United States," does not confer**

**jurisdiction on this Court to hear any claim in this case.**  The term "navigable waters of the

United States" is a jurisdictional term limiting both the reach of the Clean Water Act and of this

Court in this case. Section 311 liability is triggered only where there is proof that oil or

hazardous substances in sufficient quantities are discharged *into or upon* the navigable water

itself. 33 U.S.C. § 1311(b)(3),(7). As noted in a recent CWA case, *United States of America v.*

*Chevron Pipe Line Co.,* 437 F. Supp. 2d 605, 610 (N.D. Tx. 2006): "The heart of this argument

lies in Chevron's statement that 'it seems self-evident that the Clean Water Act does not apply in

the absence of water.'" Similarly, the Fifth Circuit has found the nature of the water body as

navigable in fact or adjacent to a navigable body of water as absolutely essential to determining

the scope of the Act in a CWA enforcement action. *In re Needham,* 354 F. 3d 340, 346 (5th Cir.

2003).

      Although as described above, a plaintiff's generalized need under Rule 8(a)(1) to

establish subject matter jurisdiction in any civil litigation is uncompromising, a plaintiff's duty in

a Clean Water Act case is arguably far greater, simply because the scope of the CWA's reach is

so uncertain, controversial, and subject to challenge. Under Section 311, "the proper inquiry is

whether … the site of the farthest traverse of the oil spill, is navigable-in-fact or adjacent to an

open body of navigable water." *United States v. Chevron Pipe Line Co.,* 437 F. Supp. 2d 605,

612 (N.D. Tx, 2006). Despite these requirements, the complaint is silent on facts that might

establish "navigability."  Even a cursory review of  ¶¶ 6, 7, 8, 9, 10, 11, 12, 20, 25 of the

complaint reveals conclusion piled on conclusion, but no facts to support the assertion that

jurisdiction under the Clean Water Act is established.

Today, in any Clean Water Act matter  -- whether that case is brought under Section 311

or under Section 301-- federal court jurisdiction cannot be established by presumption or stark

allegation because of the uncertainty brought to the jurisdictional scope of these provisions by

the Supreme Court's decisions in *Solid Waste Agency of Northern Cook Cty. v. Army Corps of*

*Engineers,* 531 U.S. 159 (2001)(*SWANCC*) and *Rapanos v. United States,* 547 U.S. 715 (2006).

In *SWANCC*, the Court rejected a regulatory definition of "waters of the United States" that, as

interpreted, had extended this jurisdictional phrase to include isolated ponds, some of which held

water only seasonally, because these ponds were used by migratory birds and thus theoretically

could affect interstate commerce.

> We said in *Riverside Bayview Homes* that the word "navigable"
> in the statute was of "limited import," 474 U. S., at 133,
> and went on to hold that § 404(a) extended to nonnavigable
> wetlands adjacent to open waters. But it is one thing to
> give a word limited effect and quite another to give it no
> effect whatever. The term "navigable" has at least the import
> of showing us what Congress had in mind as its authority
> for enacting the CWA: its traditional jurisdiction over
> waters that were or had been navigable in fact or which
> could reasonably be so made. See, *e. g., United States* v.
> *Appalachian Elec. Power Co.,* 311 U. S. 377, 407–408 (1940).

*SWANCC*, 531 U.S. at 172.  *SWANCC* held that the government's expansive interpretation of

navigable waters was so broad as to exceed the scope of the Clean Water Act, and that any

interpretation to the contrary would raise serious questions of constitutionality under the

Commerce Clause.

In *Rapanos,* the Court again examined the jurisdictional scope of the term "navigable waters." While the entire Court agreed that Congress intended the Act to cover more than traditional, obviously "navigable-in-fact" waters, the justices could not agree on what the term meant. They wrote five opinions: one plurality, two concurring, and two dissenting opinions. Justice Scalia, on behalf of a four-person plurality declared that the Act covered only "relatively permanent, standing, or continuously flowing bodies of water forming geographic features" that are described in ordinary parlance as streams, oceans, rivers, and lakes. *Rapanos,* 547 U.S. at 739. Justice Kennedy asserted that jurisdiction under the Act should encompass only waters that possess a "significant nexus" to waters that are or were navigable-in-fact or could reasonably be made so. *Id., at 787.* Justice Stevens and the remaining members of the Court dissented, supporting a broad interpretation of this jurisdictional term that would have affirmed the judgments and reasoning of the courts of appeals below. In both *SWANCC* and *Rapanos*, the Court held that the government's regulatory interpretation of this jurisdictional provision was an unwarranted extension of the statute, that if allowed would raise significant questions under the Commerce Clause. See, *SWANCC, supra,* 531 U.S. at 172-174; *Rapanos, supra, 547 U.S. at 738.*

In *United States v. Robison,* 505 F. 3d 1208 (11th Cir. 2007), decided after the Supreme Court ruling in *Rapanos,* defendants appealed their criminal convictions for illegally discharging pollutants into a creek without obtaining a permit under the Section 301(a) of the Clean Water Act. At trial, the government had produced evidence showing that Avondale Creek, the receiving body of water, was a perennial stream with a continuous, uninterrupted flow that ultimately reached the Black Warrior River. However, the government did not attempt to produce any evidence showing a hydrologic connection between the receiving Creek and the

River, and its witness acknowledged the Creek's limited depth and existing dams.  The court of appeals found that the "government produced no evidence, through [its EPA expert] or otherwise, of the chemical, physical, or biological effect that Avondale Creek's waters had or might have had on the Black Warrior River." *Robison, supra,* 505 F. 3d at 1212.  Under these circumstances, and in light of the recent Supreme Court decisions in *SWANCC* and *Rapanos* on this issue, the Eleventh Circuit found as legal error a jury instruction "that a continuous or intermittent flow into a navigable-in-fact body of water would be sufficient to bring Avondale Creek within the reach of the CWA." *Robison, supra,* 505 F. 3d at 1222.

Although it was clear to the *Robison* court that the jury instruction could not survive *Rapanos,* it was difficult for that appellate panel to determine exactly what instruction might pass muster. The Eleventh Circuit summarized the *Rapanos* opinions and declared somewhat ruefully: "As aptly noted by Chief Justice Roberts in his concurrence, neither Justice Scalia's plurality opinion, Justice Kennedy's concurrence, nor Justice Steven's dissent 'command[ed] a majority of the Court on precisely how to read Congress'[s] limits on the reach' of the CWA." *Robison, supra,* 505 F. 3d at 1217-1218.  Indeed,  the Eleventh Circuit mirrored the Supreme Court in its inability to agree on exactly how to interpret *Rapanos,* bitterly dividing over the government's petition for rehearing en banc on the question of how to interpret a 4-1-4 Supreme Court decision under these circumstances. *See, United States v. Robison,* 521 F. 3d 1319 (11th Cir. 2008)(on denial of rehearing en banc).

In light of this ongoing, jurisdictional and jurisprudential mayhem, the government does not discharge its Rule 8(a)(1) obligation to establish subject matter jurisdiction by merely declaring that "Horse Creek and its tributaries are 'navigable waters of the United States within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3); and "navigable waters'

within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7)." (¶ 25). Such a conclusory assertion of law gives the Court no idea of what facts, if any, the government may assert to establish the Court's jurisdiction exists over discharges into this water body. "The CWA and the OPA [the 1990 Oil Pollution Act as an amendment to the CWA] are not so broad as to permit the federal government to impose regulations over 'tributaries' that are neither themselves navigable nor truly adjacent to navigable waters." *In re Needham, supra,* 354 F. 3d at 346. In the absence of jurisdiction, allegations of illegal discharges are outside the scope of the CWA and efforts to enforce the Act in those circumstances will be dismissed. *United States v. Robison,* 505 F. 3d 1208 (11th Cir. 2007). *U.S. v. Chevron Pipe Line Co.,* 437 F. Supp. 2d 605, (ND Tex 2006); *Env. Prot. Info Ctr. v. Pacific Lumber,* 469 F. Supp. 2d 803 (ND Ca, 2007).

Moreover, even assuming that Horse Creek is "navigable" as that word is used in a traditional sense, the complaint is similarly deficient in failing to show that Horse Creek is also used in interstate commerce, and therefore falls within the jurisdictional perview of the CWA without offending the Commerce Clause of the Constitution. As we know from *SWANCC, supra,* absent a showing of a connection to interstate commerce, an isolated water may be beyond the jurisdictional reach of the CWA.

To pursue this action, the United States should have alleged facts (assuming such facts exist) demonstrating how, in light of *Rapanos, SWANCC,* and other recent rulings on the limits of the CWA, Horse Creek and its tributaries come within the jurisdictional scope of the CWA as navigable waters of the United States into which chlorine was discharged in reportable quantities as alleged in the first claim. The same holds true for the second count, for it simply parrots the first and differs only in its assertion that diesel fuel was discharged into Horse Creek and its tributaries. Similarly, if plaintiff fails to establish that Horse Creek and its tributaries are waters

of the United States, there is no jurisdiction to hear the government's third claim that a permit was required under the CWA. Finally, this Court's jurisdiction over the fourth claim regarding untimely notification of a spill also rests on the plaintiff establishing jurisdiction under the CWA. Thus, on these threshold issues, the plaintiff has failed in its task of proving that the Court has subject matter jurisdiction to hear any of the claims in its complaint.

2.     **Even if the government made sufficient allegations that Horse Creek is a jurisdictional water protected by the Act, the first claim in the complaint must be dismissed for lack of subject matter jurisdiction because the government does not show that a reportable quantity of chlorine was "discharged into" the Creek or even reached the Creek.**   In some CWA enforcement cases, Rule 8(a)(1) requires little time or effort by the government to establish subject matter jurisdiction with respect to "discharges."  Most likely, this is because an "*Exxon Valdez*"-like direct discharge from a ship to a waterbody is self-evident, or because the hazardous substance or oil clearly discharged is readily visible in the receiving waters.  In those circumstances, the level of detail needed to establish the Court's jurisdiction is not extensive because the jurisdictional grounds for invoking the CWA are obvious and uncontroverted. In other cases, where the circumstances of the alleged illegal conduct are not so obvious or agreed upon, the government has a greater burden under Rule 8(a)(1).  Here, the complaint simply alleges that chlorine is a hazardous substance, and that this substance was discharged "in excess of the reportable quantity of 10 pounds into or upon Horse Creek, its tributaries and their adjoining shorelines…." (Complaint, ¶ 29).  As noted earlier, Rule 8(a)(1) establishes a need to *demonstrate* subject matter jurisdiction.  Perhaps the constitutional concern for "fair notice" identified by *Bell Atlantic* would not be as compelling in this case if, after the collision, the leaking tank car had plunged into Horse Creek and discharged its cargo

directly into that waterbody (assuming that Horse Creek falls within the scope of the CWA). However, Horse Creek is more than 1,000 feet away from the accident site, and between the track and the Creek is a large factory building and a parking lot.  Again, the complaint is utterly bereft of any factual allegations showing how a punctured tank car containing liquid chlorine was able to discharge at least 10 pounds of chlorine that retained its liquid nature and reached Horse Creek before changing its molecular characteristics and vaporizing.  Furthermore, if, as a result of the breached tank car, the released chlorine vaporized at the site, this Court would have no jurisdiction because there would be no showing that the Clean Water Act had been violated. See, *Chemical Weapons Working Group Inc., v United States Dept. of the Army,* 111 F. 3d 1485 (10th Cir. 1997) (CWA does not extend to cover regulation of air emissions that result in indirect, atmospheric deposition into navigable waters).  Laws of chemistry and physics are generally as immutable as the Law of Gravity, and it is incontrovertible that the propensity for chlorine, when exposed to the environment, is to vaporize into a cloud far larger than the previous liquid state. See, supra, pp. 3-4 for chlorine's description by the Centers for Disease Control.  The complaint does not address the certainty that chlorine, when exposed, vaporizes almost immediately, thereby vaporizing this Court's jurisdiction as well.

       3.      **The second claim in the case must be dismissed for lack of subject matter jurisdiction because the complaint fails to allege any facts showing how a sheen or discoloration on Horse Creek translates into jurisdiction over the release of diesel fuel from punctured locomotive tanks.**  According to ¶ 20 of the complaint, the fuel tank on Train 192's second engine ruptured during the collision and the fuel tank on Train P-22's engine was punctured by debris.  "The two breached fuel tanks released diesel fuel into Horse Creek, its tributaries and their adjoining shorelines."  Here, again, the government's cryptic pleading fails

to establish jurisdiction over this matter because of a complete absence of facts showing that the collision was the proximate cause of the alleged sheen.

Once more, the complaint leaves the Court and the defendants wholly unenlightened about why or how the government believes that some diesel fuel reached the Creek, more than 1,000 feet away. Several incontrovertible factors operate to impose a duty under Rule 8(a)(1) on the government that extends beyond a simple declaration in its second claim that the law had been violated. The accident and fuel spill site was about 1,000 feet from the Creek, separated by Avondale Mills factory building. *See Survival Factors Factual Report*, NTSB, DCA 05 MR 008 (Sept. 28, 2005), p. 9, (Exhibit 2 to this Motion). Clean up began almost immediately, but strangely, the complaint is totally silent on when this sheen allegedly appeared on the Creek. Moreover, the Clean Water Act creates an express exemption from liability for third parties such as those retained by Norfolk Southern to conduct the diesel fuel clean up. *See,* 33 U.S.C. § 1321(c)(4) [10]. Under this confluence of incontrovertible facts, the government has a clear obligation to produce other facts in its complaint to demonstrate that subject matter jurisdiction is more than wishful thinking for the second claim.

4.    **The fourth claim of inadequate notification to the National Response Center must be dismissed for lack of subject matter jurisdiction because there are no facts to establish that the defendant failed to satisfy all statutory and regulatory notification requirements.** The initiation of any civil action by the United States is a very serious matter, of immediate consequence to any potential defendant and a matter of substantial concern to the entire regulated community. These types of actions, as well as certain class action filings, some

---

[10] Section 311(c)(4) provides pertinent part: "(A) A person is not liable for removal costs or damages which result from actions taken or omitted to be taken in the course of rendering care, assistance, or advice consistent with the National Contingency Plan or as otherwise directed by the President relating to a discharge or a substantial threat of a discharge of oil or a hazardous substance."

RICO suits and similar claims can create the "in terrorem" effect identified by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741 (1975), and raise the "fair notice" concerns reaffirmed in *Bell Atlantic.*

Here, there was a tragic derailment resulting from a one-time human error at the safest railroad in the nation.  Moreover, once the derailment occurred, it is a matter of public record that in less than 50 seconds after the collision, and hours before the identification of the released chemical as chlorine, a Norfolk Southern crew member reported the event to the company and, within twenty minutes thereafter, there were four communications between NS and first responders.  *See Survival Factors Factual Report*, NTSB, DCA 05 MR 008 (Sept. 28, 2005), exhibit 14 (NS Timeline),(Exhibit 3 to this Motion).  This is not a situation where, hypothetically a pipeline company continues to operate a quasi-porous pipeline over a period of time, ignoring leaks and failing to report releases that become discharges under the  CWA.   Nor is this a situation in which the owner or operator of a facility affirmatively attempted to cover up or obscure the fact of a discharge.  Instead, this case involves a derailment to which Norfolk Southern officials responded as quickly as possible, providing virtually immediate notification and then mobilizing every facility, contractor, and instrumentality available to it.

In light of these incontrovertible facts, the government has an obligation to demonstrate that this Court has jurisdiction over its lack of notice claim by alleging facts which would reveal the theory behind this assertion of civil liability.  The government, however, has only made conclusory legal allegations that the defendant violated Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).  (Complaint, ¶ 44).  The defendant is entitled to know from the face of a complaint what it should have done, what it failed to do, and how under the facts of this case, it still transgressed the notice requirement contained in CERCLA.  *Bell Atlantic* demands that before the parties

embark on a lengthy, expensive process, replete with experts and the full panoply of trial, plaintiff give the defendant fair notice of its claims, and that plaintiff give the Court the factual recitation needed to assure its jurisdiction over this dispute.  Because the government has not done so, this Court is without subject matter jurisdiction over this claim.

II.    IN THE ALTERNATIVE, THIS CASE SHOULD BE DISMISSED UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED.

In *Arbaugh v. Y&H Corporation,* 546 U.S. 500 (2006), the Supreme Court concluded that the requirement in Title VII of the Civil Rights Act that defendant have fifteen or more employees is not a jurisdictional requirement.  Instead, it found that the statutory limitation on the scope of the Act was a substantive limitation on illegal conduct, rather than a jurisdictional provision establishing the court's power to hear the dispute.  Under that circumstance, the Court held that in cases otherwise subject to a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), it would be more appropriate to file a motion to dismiss for failure to state a claim under Rule 12(b)(6).

It is unclear whether the scope of the distinction between jurisdictional and substantive provisions in the *Arbaugh* case would be applicable to the jurisdictional sections of the Clean Water Act.  In other contexts, courts have concluded that when the subject matter jurisdictional issues are based on the same statute that provides the substantive claim, subject matter jurisdiction is so inextricably intertwined with the merits as to make a Rule 12(b)(6) motion appropriate.  *See, for example, Martinez v. U.S. ,* 311 F. Supp. 2d 1274 (D, NM 2004).

If that approach appears to be the appropriate vehicle for considering these objections to the complaint, we respectfully would ask the Court: (1)  to apply the principles of *Bell Atlantic,*

*Rapanos* and the other authorities relied upon in this document, (2) treat this motion as one under Rule 12(b)(6) for failure to state a claim on which relief could be granted, and (3) issue an order dismissing the complaint on those grounds.

## CONCLUSION

For the foregoing reasons, Norfolk Southern respectfully requests that its Motion to Dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) be granted.  In the alternative, the motion to dismiss should be treated as a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) and should be granted.

Respectfully submitted,

s/ Ronald K. Wray, II
Ronald K. Wray, II, Esq.
Christopher M. Kelly, Esq.
Gallivan, White & Boyd, P.A.
55 Beattie Place, Suite 1200
P.O. Box 10589
Greenville, SC 29603
(864) 271-5362
(864) 271-7502 FAX
rwray@gwblawfirm.com
ckelly@gwblawfirm.com

Karen Aldridge Crawford
Nelson Mullins Riley and Scarborough
1320 Main Street
P.O. Box 11070
Columbia, S.C. 29211
(803) 255-9442
(803) 255-9145 FAX
karen.crawford@nelsonmullins.com

Of Counsel:
Jeffrey H. Burton, Esq.
Laura D. Hunt, Esq.
Norfolk Southern Corporation
Three Commercial Place
Norfolk, VA 23510-9241
(757) 629-2607 FAX
jeffrey.burton@nscorp.com
laura.hunt@nscorp.com